IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JACKIE SHIPMAN                                                                    PLAINTIFF

V.                                           NO. 08-5178

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration                                                                    DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jackie Shipman, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration (Commissioner),

denying his claims for disability and disability insurance benefits under Title II of the Social Security

Act (the Act) and Supplemental Security Income under Title XVI of the Act.  In this judicial review,

the court must determine whether there is substantial evidence in the administrative record to support

the Commissioner's decision.  See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff originally applied for disability insurance benefits as well as supplemental security

income on October 22, 1998. (Tr. 77-79).  His applications were denied on March 10, 1999. (Tr. 53-

54).  Plaintiff again applied for disability insurance benefits, as well as supplemental security income

benefits on February 20, 2001, alleging he became disabled on February 2, 1996.  (Tr. 83-85, 224-

228). The Social Security Administration denied the claims initially and upon reconsideration, and

he requested a hearing.  (Tr. 61, 55, 59, 231, 235).  A hearing was held before the Administrative

Law Judge (ALJ) on April 9, 2002.  (Tr. 23-46).  On September 10, 2002, the ALJ issued an

unfavorable decision. (Tr. 7-18). The Appeals Council declined Plaintiff's request for review on

October 10, 2002. (Tr. 3-4). Plaintiff appealed to the United States District Court, and on November

14, 2003, upon request of the Commissioner, the District Court reversed and remanded the case for

further administrative proceedings. (Tr. 275-276).

A second hearing was held on July 15, 2004. (Tr. 480-512). The ALJ issued an unfavorable

decision on November 23, 2004. (Tr. 258-270). The Plaintiff sought Appeals Council review and

the Appeals Council remanded the case for resolution of the issues set out in the Order of Appeals

Council, directing the ALJ to obtain supplemental evidence from the Vocational Expert (VE) and

to identify and resolve any conflicts between the occupational evidence provided by the VE and

information in the Dictionary of Occupational Titles (DOT). (Tr. 288-289).

A third hearing was held on June 13, 2006. (Tr. 461-479), at which time Plaintiff and a VE

testified. The ALJ issued an unfavorable decision on October 25, 2006. (Tr. 240-253). On June 27,

2008, the Appeals Council denied the Plaintiff's request for review, concluding that the ALJ

adequately evaluated the objective medical evidence as well as Plaintiff's subjective allegations, and

obtained the necessary supplemental testimony from a VE as directed. (Tr. 236-238).

In his decision, after careful consideration of the entire record, the ALJ made the following

findings:

- The Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability;

- The Plaintiff had an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations;

- The medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

- The Plaintiff's allegations regarding his limitations were not totally credible;

- The ALJ carefully considered all of the medical opinions in the record regarding the severity of Plaintiff's impairments;

- The Plaintiff had the residual functional capacity (RFC) for, at most lifting and/or carrying no more than 50 pounds occasionally and 25 pounds frequently. Additionally, while the Plaintiff would not be limited in terms of standing and/or walking for up to 6 hours during a workday or from sitting for up to 6 hours during a workday, the Plaintiff would be limited to no more than occasional fine manipulation with the left hand (limited to no more than frequently as to the right), occasional reaching and/or pushing/pulling with the left upper extremity (limited to no more than frequently as to the right upper extremity), and the Plaintiff could only occasionally climb stairs, balance, stoop, crouch, kneel or crawl. Finally, the Plaintiff would also be limited to no work involving heights or moving machinery.

- The Plaintiff had past relevant work as described in the decision;

- The Plaintiff was an individual closely approaching advanced age.

- The Plaintiff had a high school education;

- Although the Plaintiff's limitations did not allow him to perform the full range of medium work, using the medical-vocational guidelines as a framework for decision-making, there were a significant number of jobs in the national economy that he could perform;

- The Plaintiff met the insured status requirements of the Act through June 30, 2001;

- The Plaintiff was not under a "disability," as defined in the Act, at any time through the date of the decision.

(Tr. 252-253).

Plaintiff raises three issues on appeal: 1) Whether the ALJ's decision denying Plaintiff disability benefits is based on substantial evidence as a whole; 2) Whether the ALJ failed to consider all of the relevant evidence in determining the Plaintiff's RFC; and 3) Whether the ALJ wrongfully concluded that Plaintiff's allegations of disabling pain were not explicitly supported by the medical record.

**Evidence Presented**

From 1984 to 1995, Plaintiff was a mechanic with Holt Truck Repair, where he worked on engines, transmissions, anything in a mechanical line as far as rebuilding, repairing big trucks, diesel trucks and automobiles. (Tr. 27). He fell from a ladder at work and went through physical therapy as a result. (Tr. 30). Plaintiff alleged his disability onset date of February 2, 1996. (Tr. 83). Prior to that, he had been to the Cooper Clinic on a few occasions, complaining of lower back pain. (Tr. 407,153, 158). Two of those records reflect that his lower back pain had improved significantly with physical therapy. (Tr. 153-154). A radiology report from Cooper Clinic indicated that degenerative changes and wedge deformity of the thoracic spine remained stable. (Tr. 155). On November 5, 1996, as a result of a motor vehicle accident, Plaintiff presented himself to Crawford Memorial Hospital. Four days later, on November 5, 1996, Plaintiff saw Dr. Allen L. Beachy at the Cooper Clinic. Dr. Beachy concluded that his right knee pain and contusion secondary to the motor vehicle accident probably represented a simple mechanical strain without evidence of meniscal or ligament strain. (Tr. 151).

From July 1998 to October 1998, Plaintiff saw Dr. R. Wendell Ross at the Cornerstone Family Clinic. When he first saw Dr. Ross on July 24, 1998, Plaintiff told Dr. Ross that no medications ever really helped him and that he had not seen a doctor in a long time. (Tr. 406). He complained to Dr. Ross of mid lower back pain although he was not on any medications. (Tr. 406). Plaintiff stated that at night, the pain is so bad that he can not tolerate it, and he gets up and walks around, uses heat, smokes cigarettes, and dips Copenhagen. (Tr. 406). On July 27, 1998, Dr. Ross's analysis was "Chronic lumbosacral strain with inactivity, depression, not suicidal but very despondent. Possibly some early arthritic changes." (Tr. 405). Dr. Ross asked Plaintiff to make

great effort to begin stretching exercises, to stop using smokeless tobacco and to begin Arthrotec 50

t.i.d., and gave him samples.  (Tr. 405).  When Dr. Ross saw Plaintiff again on August 5, 1998, there

had been no change in the physical examination from his previous visit, and Dr. Ross suggested to

Plaintiff that they take another approach of using 50 mg. of amitriptyline at bedtime in order to help

him rest, raise the pain threshold and help with his despondency and depression.  (Tr. 404).

On September 2, 1998, Plaintiff again went to Cornerstone Family Clinic, complaining of

his stomach bothering him all the time and that he could not sleep at night. (Tr. 403).  It was noted

that he was "still dipping" and that his diet had not been appropriate. (Tr. 403).  On September 9,

1998, Plaintiff was admitted with back pain to the Crawford Memorial Hospital.  (Tr. 159).  A

radiology report of the lumbar spine MRI, reflected that there was:

> Focal central annular bulging or mild disc protrusion at T12/L1.  Degeneration of several
> discs as noted above, but no other disc protrusion.

(Tr. 161).

On October 7, 1998, Plaintiff appeared at Cornerstone Family Clinic again.  The medical

record reflects:

> Quite a hypochondriac fellow who comes in today complaining of severe chest pain radiating
> to the left side of his neck and down his left arm.  Feeling extremely weak and dizzy and this
> has been going on for over a wk.

(Tr. 402).

On October 13, 1998, a Neurodiagnostic Laboratory report from Crawford Memorial

Hospital reflected that Plaintiff had "Bilateral carpal tunnel syndrome, moderate in severity.  There

is no evidence for diffuse neuropathy."  (Tr. 164).  On November 5, 1998, Dr. Eugene F. Still

performed an operative procedure referred to as release of left carpal tunnel on Plaintiff's left hand.

(Tr. 169). In follow-up reports dated November 16, 1998, and December 14, 1998, Dr. Still noted that Plaintiff had done very well with the surgery. (Tr. 172).

On February 1, 1999, a General Physical Examination was performed on Plaintiff by Dr. Ross, who noted that Plaintiff's alleged impairments were degenerative bone disease in his back and pain in his back, arm and legs. (Tr. 174). He found that Plaintiff had a slow gait due to pain and discomfort and could stand and walk without assistive devices. (Tr. 179). He further found that Plaintiff had the ability to walk on heel-toes for a very short period and could not squat and arise from a squatting position. (Tr. 179). Dr. Ross's diagnosis was: Bilateral carpal tunnel syndrome, degenerative disc disease (DDD) and degenerative arthritis of the lumbar spine. (Tr. 181). Dr. Ross concluded that Plaintiff could sit, stand, hear and speak normally, but could not carry or handle objects for anymore than short periods of time due to the chronic carpal tunnel syndrome and his DDD of the lumbar spine, and could travel normally. (Tr. 181). Notably, in a report dated February 15, 1999, Dr. Still found that Plaintiff had done well with his hand surgery and did not think he needed any other treatment. In fact, Plaintiff told Dr. Still that he had 5,000 raspberry plants that he was going to put out and believed he could do that. (Tr. 172).

On May 24, 2001, a General Physical Examination was performed on Plaintiff by Dr. William J. McGowan. (Tr. 190-197). Dr. McGowan diagnosed Plaintiff with chronic lumbar pain and possible lumbar DDD, arthralgia wrist, shoulders, and a history of tremulousness/history of allergies. (Tr. 196). In a letter of the same date, Dr. McGowan found that upon x-ray of the lumbar spine, AP and lateral, a presence of Schmorl nodes was shown from L1 through L5 with good alignment of the vertebra otherwise. (Tr. 198). "This is consistent with possible lumbar degenerative disc disease. Otherwise normal for age." (Tr. 198). Dr. McGowan's primary diagnosis

was disorder of the back and secondary diagnosis was history of carpal tunnel syndrome, by report. (Tr. 49). He found that Plaintiff was not disabled, and concluded that the evidence showed that Plaintiff's condition did limit some of his activities, but that the limitations were not severe enough to meet disability requirements. (Tr. 50).

A Physical Residual Functional Capacity Assessment was completed by Dr. Ronald M. Crow on October 3, 2001, and Dr. Crow found Plaintiff was not disabled. (Tr. 213-220, 233). Dr. Crow's primary diagnosis was degenerative disc disease, (Tr. 51) and he concluded that Plaintiff could: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8 hour workday; could push and/or pull in unlimited way; and had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 214-217).

A second General Physical Examination was performed on April 6, 2004, by Dr. McGowan (Tr. 427-433), who found that: Plaintiff's cervical and lumbar spine ranges of motion were within normal limits; Plaintiff's limb functions were normal and he exhibited normal reflexes and had no muscle weakness or sensory abnormalities; Plaintiff could slowly squat and arise from a squatting position; and Plaintiff was taking Aleve for medication. (Tr. 427, 430,431). Dr. McGowan concluded that Plaintiff could perform work activities, and found that due to his diagnosis, Plaintiff's ability to lift, carry and handle objects was "mildly limited." (Tr. 433). Dr. McGowan determined that Plaintiff could:

- Frequently lift and/or carry up to 20 lbs;

- Occasionally lift and/or carry up to 100 lbs;

- Sit, stand or walk for 8 hours in an 8 hour workday;

- Frequently use a simple grasp, handle objects and feel objects and push/pull/operate controls with his feet;

- Occasionally use his hands/feet/arms for fine manipulation, push/pull/operate controls using his hands;

- Occasionally climb, balance, stoop, crouch, kneel, and crawl;

- Have moderate exposure to heights, moving machinery, chemicals, noise, humidity, dust/fumes, temperature extremes, and vibrations;

- Have unlimited ability to hear and speak.

(Tr. 438).  Dr. McGowan examined Plaintiff twice and rendered specific, complete opinions as to Plaintiff's condition and abilities.

On June 16, 2005, Plaintiff presented himself to Washington Regional Medical Center as a result of falling and landing on his right hip. (Tr. 448).  X-rays showed an impacted cervical femoral neck fracture on the right.  (Tr. 448).  Surgery was performed on Plaintiff's right hip by Dr. Tom Patrick Coker, of the Ozark Orthopaedic & Sports Medicine Clinic.  (Tr. 447).  Dr. Coker treated the fracture with three screws, through a small stab incision.  (Tr. 443).

At the third hearing held before the ALJ on June 13, 2006, Plaintiff testified that he did not have a current treating doctor and that he had not been back to any doctor since seeing Dr. Coker on July 1, 2005.  (Tr. 466, 472).  He testified that he could probably lift 10 to 12 pounds and that he does have some good days.  (Tr. 471).  He stated that he had carpal tunnel in his hands and that he starts shaking and trembling and cannot hold onto things.  He also testified that his left hand seemed to be worse than it was before the surgery because it burned and tingled.  (Tr. 470).  During the day he sits at home and watches his children and tries to walk and keep his hip and back where he can

get around.  (Tr. 471).  He keeps a walker and cane handy.  (Tr. 471).  He stated that he had tried to

go to two clinics, but they said his wife made too much money.  (Tr. 466).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir.

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

would find it adequate to support the Commissioner's decision.  The ALJ's decision must be

affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d

964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the

Commissioner's decision, the court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the court would have decided

the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after

reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young

v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of

proving his disability by establishing a physical or mental disability that has lasted at least one year

and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274

F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act

defines "physical or mental impairment" as "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A plaintiff must

show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**Discussion**

The Plaintiff was diagnosed with bilateral carpal tunnel syndrome and degenerative disc disease.  As previously indicated, surgery was performed on Plaintiff's left hand on November 5, 1998, by Dr. Eugene F. Still and the surgery went well.  On February 1, 1999, Dr. R. Wendell Ross indicated that Plaintiff could not carry or handle objects for any more than short periods of time due to the chronic carpal tunnel syndrome and DDD of the lumbar spine.  However, on February 14, 1999, Plaintiff reported to Dr. Still that he had 5,000 raspberry plants he was going to put out with the right hand and believed he could do it.  (Tr. 172).  Furthermore, Dr. William McGowan found that although Plaintiff's condition limited some of his activities, the limitations were not severe enough to meet disability requirements.  (Tr. 197, 50).  On April 6, 2004, Dr. McGowan found that

although Plaintiff's ability to lift, carry and handle objects was mildly limited, x-rays of Plaintiff's

cervical spine, wrists and hands revealed the following:

- X-ray of the cervical spine, AP and lateral: Lateral x-ray shows seven cervical vertebrae. There is diminished disc space with Schmorl nodes, especially from C4-C7.  Findings are consistent with mild to moderate degenerative disc disease.  The AP is normal for age.

- X-ray of wrist, AP and lateral, right: The radius, ulna and visible carpal bones appear within normal limits for the patient's age.

- X-ray of the hand, two views, right: The carpal, metacarpal and phalanges are present and appear within normal limits for the patient's age on both views.

- X-ray of the wrist, AP and lateral, left: The radius, ulna and visible carpal bones appear normal for age with slight radial deviation, possibly due to positioning.

- X-ray of the hand, two views, left: The metacarpal, carpal bones, phalanges in both views appear within normal limits for the patient's age.

(Tr. 437).  In addition, in a Disability Determination report prepared by Dr. Bakleh on March 3,

2003, he found Plaintiff's Carpal tunnel syndrome now "with good ROM."  (Tr. 416).

With respect to Plaintiff's degenerative disc disease, Dr. Ross stated that he could sit, stand,

hear and speak normally.  (Tr. 181).   Dr. Ross also found normal motion of the cervical spine and

lumbar spine.   Further confirmation regarding Plaintiff's physical abilities came from  Dr.

McGowan, who found that Plaintiff's limitations were not severe enough to meet disability

requirements.  (Tr. 50).   Finally, in a Physical RFC Assessment dated April 24, 2003, no postural,

manipulative, visual, communicative, environmental limitations were established.  (Tr. 419-421).

With respect to Plaintiff's allegations of disabling pain, the ALJ must not only consider

whether there is an objective medical basis to support the degree of severity of subjective complaints,

but must give full consideration to all of the evidence presented relating to subjective complaints,

including the claimant's prior work record, and observations by third parties and treating and

examining physicians relating to such matters as:

• the claimant's daily activities;

• the duration, frequency and intensity of the pain;

• the precipitating and aggravating factors;

• dosage, effectiveness and side effects of medication; and

• functional restrictions.

Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  "The adjudicator is not free to accept or

reject the claimant's subjective complaints *solely* on the basis of personal observations.  Subjective

complaints may be discounted if there are inconsistencies in the evidence as a whole."  Id.

At his most recent hearing, Plaintiff stated that he hurt all the time and yet did not have a

current treating doctor.  (Tr. 466).  He testified that he could hardly lift a coffeepot and yet said he

could probably lift 10-12 pounds.  (Tr. 469).  He testified that he does have some pain-free days and

yet said that on good days, the pain is weaker.  (Tr. 471).  He testified that during the day he sat at

home and watched his kids, tries to walk and to keep his hip and back where he can get around.  He

testified that he keeps a walker and cane handy, but had not seen a doctor since July of 2005.  (Tr.

472).

Plaintiff also testified that he had no money to go to the doctor.  While it is for the ALJ in

the first instance to determine a plaintiff's motivation for failing to follow a prescribed course of

treatment, or to seek medical attention, such failure may be excused by a claimant's lack of funds.

Tome v. Schweiker, 724 F.2d 711, 714 (8TH Cir. 1984); Jackson v. Bowen, 866 F.2d 274, 275 (8th

Cri. 1989).  "Although it is permissible in assessing the severity of pain for an ALJ to consider a

claimant's medical treatment and medications, the ALJ must consider a claimant's allegation that

he has not sought medical treatment or used medications because of a lack of finances." Dover v.

Bowen, 784 F.2d 335, 337 (8ᵗʰ Cri. 1986) (Citing Tome v. Schweiker, 724 F.2d at 714).  The court

finds there is substantial evidence to support the ALJ's finding that Plaintiff's assertion of lack of

funds was not necessarily the reason he did not seek medical treatment or use medications.

Throughout the record, there are inconsistencies with respect to why Plaintiff did not go to the doctor

or take anything other than over the counter medications.  For example, although Plaintiff asserted

that medications made him sick (Tr. 129), and that he did not like pills (Tr. 144), he also asserted

that the medication the doctors gave him did not seem to do any good (Tr. 36), or that physical

therapy did not work (Tr. 144), which is contrary to notes contained in the medical records.  The

failure to seek aggressive medical care is not suggestive of disabling pain.  Chamberlain v. Shalala,

47 F.3d 1489, 1494 (8ᵗʰ Cir. 1995).  The Court agrees that it was appropriate for the ALJ to discount

Plaintiff's testimony as to the severity of his condition, and that the Plaintiff's complaints were not

objectively corroborated at the level which would reasonably lead him to find that Plaintiff's pain

or functional restrictions had been completely disabling.

The ALJ concluded that although Plaintiff's limitations did not allow him to perform the full

range of medium work, using the medical-vocational guidelines as a framework for decision-making,

there was a significant number of jobs in the national economy that Plaintiff could perform.  (Tr.

253).

At the hearing, the ALJ asked the Vocational Expert to assume a person with Plaintiff's

vocational profile and the following limitations, of a right-hand-dominant person:

> We're going to have an individual who can lift and carry up to 50 pounds occasionally, but only 25 pounds frequently, and can push and pull within those limitations. The individual can push and pull within those limitations. The individual can stand and walk for eight hours, and can sit for eight hours. On manipulative limitations, the individual can frequently grasp; perform gross manipulation, that is, handle objects; and feel objects. The individual can only occasionally perform fine manipulation with his left upper – his left hand, and frequently with the right hand. And the individual can only occasionally reach with the left upper extremity, and frequently with the right. As far as postural limitations are concerned, the individual can at least occasionally climb stairs, balance, stoop, crouch, kneel, and crawl. As far as environmental limitations are concerned, the individual should avoid most work at unprotected heights, and work around unprotected moving machinery. If an individual just had these limitations, could such an individual perform the past relevant work you've identified for the claimant?

(Tr. 474-475).

The VE responded that this individual could not perform past relevant work but could perform unskilled jobs such as machine operator jobs, cashier II at the light unskilled level, and fast food worker. (Tr. 475-476). The ALJ then posed a second hypothetical to the VE:

> If the lifting and carrying, and standing, walking, and sitting limitations were at the light level; that is, lifting and carrying was 20 pounds occasionally and 10 pounds frequently, pushing and pulling there, standing and walking six of eight, and sitting six of eight, and the same other limitations, would they be able to do those same jobs, since they're light unskilled?

(Tr. 476).

The VE responded to the above posed question affirmatively. The ALJ then proposed another hypothetical:

> If such an individual could lift and carry only 10 pounds occasionally and five pounds frequently, and could push and pull within those limitations; could stand and walk for at least two hours of an eight-hour workday, and could sit for at least six hours out of an eight-hour workday; and all other limitations would be the same as the first two hypotheticals, are there – will that eliminate any of the jobs you gave me?

(Tr. 477).

-14-

The VE responded by saying that a small percentage of the cashier II jobs would still remain but in a reduced number. (Tr. 477). Although a cashier II job is defined as light in the DOT, the VE stated that a certain percentage of them are performed at the sedentary level, customarily. (Tr. 477). The VE added that there would also be a small group of machine tender operator jobs at the sedentary unskilled level that would be available. (Tr. 477). The ALJ then propounded a final hypothetical to the VE:

> As testified to by the claimant, if an individual cannot stand, walk, and sit in any combination for eight hours of an eight-hour workday, will this eliminate any of the other jobs?

(Tr. 477).

The VE stated that this would eliminate those jobs. (Tr. 478).

It is clear that the hypotheticals posed to the VE by the ALJ fully and adequately set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). It is also clear that there is substantial evidence to support the ALJ's finding that, based upon the VE expert evidence and, after considering Plaintiff's age, educational background, work experience and RFC, Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy.

In light of the foregoing, and after reviewing the entire record in the present case, considering all of the testimony and medical records contained therein, the Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff is not disabled; that the ALJ considered all of the relevant evidence in determining Plaintiff's RFC; and that the ALJ properly concluded that Plaintiff's allegations of disabling pain were not explicitly supported by the medical record.

**Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and recommends affirming the decision of the ALJ.  **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. §636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 20th day of November, 2009

/s/ *Erin L. Setser*
HONORABLE ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE